IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2016

IN RE DUSTIN L. ET AL.

Appeal from the Juvenile Court for Anderson County
Nos. J-31746 to -31750, J-31555     Brian J. Hunt,  Judge

No. E2015-02265-COA-R3-PT-FILED-SEPTEMBER 28, 2016

This is a termination of parental rights case focusing on the six minor children of Tonya F. ("Mother") and Joshua F. ("Father").  On February 9, 2015, the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Mother and Father.  DCS alleged as a basis for termination the statutory grounds of (1) failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, and (3) persistence of the conditions leading to removal of the children.  Following a bench trial, the trial court granted the petition upon its determination by clear and convincing evidence that DCS had proven all three statutory grounds alleged.  The court further determined by clear and convincing evidence that termination of Mother's and Father's parental rights was in the children's best interest.  Mother and Father have appealed. Inasmuch as DCS has conceded that the elements of abandonment through failure to provide a suitable home were not proven as to either party, we reverse this statutory ground.  We affirm the trial court's judgment in all other respects, including the termination of Mother's and Father's parental rights to the children.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed in Part, Reversed in Part; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Paul L. Sexton, Oak Ridge, Tennessee, for the appellant, Tonya F.

Darrell W. Sproles, Wartburg, Tennessee, for the appellant, Joshua F.

Herbert H. Slatery, III, Attorney General and Reporter, and Rachel E. Buckley, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

L. Rosillo Mulligan, Harriman, Tennessee, Guardian Ad Litem.

**OPINION**

**I. Factual and Procedural Background**

This case involves termination of Mother's and Father's parental rights to their six minor children: Dustin L., Patrick L., Laynie F., Tamra F., Cheyenne F., and Julian F. ("the Children").[1] The Children were removed from Mother's and Father's custody by order of the Campbell County Juvenile Court, dated December 18, 2012, and placed in the custody of their paternal grandmother, who was a resident of Anderson County. The Campbell County Juvenile Court subsequently adjudicated the Children to be dependent and neglected on February 28, 2013, based upon the condition of Mother's and Father's home. Mother and Father waived the adjudicatory hearing, stipulating that their home was not appropriate for the Children.

On December 18, 2013, the Anderson County Juvenile Court ("trial court") entered a Protective Custody Order removing the Children from the custody of their paternal grandmother, upon a petition filed by DCS alleging abuse and neglect by the paternal grandmother and her live-in paramour. DCS also alleged that the paternal grandmother had been violating the prior temporary custody order by allowing the parents to exercise unsupervised visitation with the Children at the parents' home. The Children were placed in foster care at that time. The Campbell County Juvenile Court transferred jurisdiction of this matter to the trial court on January 9, 2014.

DCS created the first permanency plan with the parents on January 16, 2014.[2] The permanency plan provided that the parents would: (1) visit with the Children at least 4.3 hours per month, (2) provide and maintain an appropriate and safe living environment with working utilities, (3) provide beds with frames for all of the Children, (4) store their medications and guns in a safe manner out of the reach of the Children, (5) complete alcohol and drug assessments and follow all recommendations, (6) cooperate with in-home services, (7) submit to random drug screens, (8) provide documentation regarding valid prescriptions, (9) comply with all court orders, and (10) complete psychological evaluations or sign releases to allow DCS to access prior evaluations.

---

[1] Father is not the legal father of the oldest two children, Dustin L. and Patrick L. Their legal father voluntarily surrendered his parental rights to the subject children prior to the termination hearing, and he is not a party to this appeal.

[2] Although this plan was ratified by the trial court on February 11, 2014, we note that the requirement contained in Tennessee Code Annotated § 37-2-403 (2014), directing the juvenile court to ratify the permanency plan within sixty days, is "directory and not mandatory." *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003). Ergo, a permanency plan that is not ratified within this timeframe is not considered a nullity. *Id.*

A subsequent permanency plan was created on February 26, 2014. This plan reveals that the trial court had entered a no-contact order prohibiting contact between the parents and the Children.[3] For this reason, the visitation requirement was removed, but the other requirements of the prior plan were reiterated in the February 26 plan. The next permanency plan was created on June 19, 2014. Because the no-contact order was still in effect, the June 19 plan was virtually identical to the February 26 plan. The only additional requirements were: (1) Mother to resolve her legal issues relating to a recent DUI charge, (2) the parents to submit to random pill counts, and (3) DCS to compile a list of environmental issues regarding the parents' home that needed to be resolved for the safe return of the Children. On November 21, 2014, the trial court entered a review order finding the parents to be in substantial noncompliance with the permanency plans. In this order, the court states that the parents had failed to comply with the requirement of psychological evaluation recommendations, failed to comply with in-home services, and failed to address the environmental concerns in the home.

A subsequent permanency plan was created on January 22, 2015. By this time, the parents had been allowed to resume visitation with the Children, such that the requirement of visitation of at least 4.3 hours per month was again included in the plan. The only other requirement added to this plan provided that the parents should not incur any new criminal charges. The final permanency plan was created on May 27, 2015. By this time, DCS had filed the termination petition on February 9, 2015. The final permanency plan was virtually identical to the January 22, 2015 plan.

The trial court conducted the termination hearing on September 17 and 18, 2015. The parents appeared in court approximately half-way through the first day of trial. They testified during the second day of trial. Other witnesses included the family's current and former DCS family service workers, the in-home service worker for Youth Villages (a DCS contractor), and the fifteen-year-old child, Patrick L. Following the bench trial, the court entered an order terminating the parents' parental rights. The court determined that DCS had proven by clear and convincing evidence the statutory grounds of (1) failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, and (3) persistence of the conditions leading to removal of the Children. The court further determined by clear and convincing evidence that termination of Mother's and Father's parental rights was in the Children's best interest. Mother and Father timely appealed.

---

[3] This no-contact order appears to be based upon allegations that the parents were "coaching" the Children not to report abuse by the paternal grandmother's paramour, as well as allegations that the Children were "hysterical" and suffered an increase in nightmares and defiant behavior following visits with the parents.

3

## II. Issues Presented

Mother and Father present identical issues for our review, which we have restated as follows:

1. Whether the trial court erred by finding clear and convincing evidence that the conditions leading to the Children's removal into protective custody persisted.

2. Whether the trial court erred by finding clear and convincing evidence that it was in the Children's best interest to terminate Mother's and Father's parental rights.

In addition, DCS raises the following issue, which we have restated slightly:

3. Whether the trial court erred by finding clear and convincing evidence that Mother and Father had substantially failed to comply with the statements of responsibilities in the permanency plans.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2016) lists the statutory grounds for termination of parental rights, providing in relevant part as follows:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of three statutory grounds to terminate Mother's and Father's parental rights: (1) abandonment by failure to provide a suitable home pursuant to Tennessee Code Annotated § 36-1-113(g)(1), (2) persistence of conditions leading to the Children's removal pursuant to Tennessee Code Annotated § 36-1-113(g)(3), and (3) failure to substantially comply with the reasonable responsibilities set out in the permanency plans pursuant to Tennessee Code Annotated § 36-1-113(g)(2). In its appellate brief, DCS concedes that the requirements of the statutory ground of abandonment by failure to provide a suitable home were not proven by clear and convincing evidence. Upon our review of the record, we agree. Therefore, this ground must be reversed on appeal. We will address the remaining termination grounds found by the trial court in turn.

A. Persistence of Conditions Leading to the Children's Removal

The trial court found clear and convincing evidence as to both parents of the statutory ground of persistence of conditions leading to removal of the Children from the parents' home. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

In its final judgment, the trial court made the following specific findings regarding this statutory ground:

> In this case, pursuant to Tenn. Code Ann. §36-1-113(g)(3), the Court finds that there is clear and convincing evidence that the conditions which led to the removal of the children persist to this day. It has been thirty-three months since the children were removed from the parents' home and twenty-three months since the children have been in state custody. The children were removed from the parents' home due to extreme environmental concerns which made it unsafe for the children to reside there. These conditions persist to this day. As detailed above in Ground 1, Abandonment by Failure to Provide a Suitable Home, the Court finds that the parents' home remains unsafe and unsuitable for the children to return home. Further, other conditions exist in the home that would, in all reasonable probability, lead to further neglect or abuse of the children, in that the parents have not completed the recommendations of their assessments and have not actively participated in services or therapy. The Court finds that because the children have been removed from the parents' home for thirty-three months with little progress made by the parents in completing the tasks required of them on the permanency plans, despite reasonable efforts by DCS to assist them, that there is little likelihood that these conditions will be remedied in the near future so that the children can

7

be safely returned to the parents. Continuation of the parent-child relationship greatly diminishes the children's chances of being placed into a safe, stable and permanent home.

Upon careful review, we determine that a preponderance of the evidence supports the trial court's findings as to persistence of the conditions leading to removal of the Children from Mother's and Father's home. In the initial petition seeking removal of the Children, DCS stated the following regarding the family home:

The family of eight resides in a two bedroom house, but one of the bedrooms cannot be used. It is packed full of junk and the door to the room is padlocked with a bookcase in front. The six children and two adults utilize one bedroom that has two twin beds which are difficult to access due to frequently also being piled with various junk-type items and clothes. There is also a couch in the home. The kitchen has lots of clutter and dirty dishes. The bathroom is relatively clean, but there is no water in the bathroom sink. The tub and toilet do function. Both mother and father demonstrate hoarder-type behaviors. The Department has put in-home services through Solution Source to work with the family, and has rented a dumpster for a week to assist the family in disposing of some of the inordinate amount of clutter, garbage and junk.

The Department has had numerous referrals since 2000 on this family, with most of them stemming from environmental issues. In each case, the parents will make some improvements while the investigation is pending, but shortly after the Department's intervention ends, the home rapidly deteriorates to the condition it was or even worse. Currently, it seems as if the house is deteriorating more and more each year. The crawl space underneath the house is packed full of junk. There is a half-built addition to the home that is unstable and not useable. There are several non-working vehicles and a camper in the front yard, all of which are full of clothes, junk and garbage. While the family has made some improvements to the front yard, there are nails, broken glass and other dangerous debris in the yard which poses a hazard to the children. The front porch is also loaded with various items and the roof is falling in. The flooring of the home feels as if it could possibly give way.

There is only one exit to the home, and due to the amount of clutter, it is difficult to navigate through the home. The only source of heat in the home is a kerosene heater. There are concerns that the heater and the

clutter pose a fire hazard to the children. There are no smoke alarms in the home.

Crystal Mitchell, the DCS worker who was assigned to this family from December 18, 2012, until May 1, 2015, testified at trial that she was present at the parents' home in February 2014, approximately fourteen months after the Children were removed. Ms. Mitchell took photographs of the home at that time, which were presented to the court as exhibits. These photographs demonstrate that the interior and exterior of the home remained extremely cluttered, as described in the December 2012 removal petition. In addition to the clutter, Ms. Mitchell explained that the yard still contained broken glass, nails, sharp tools, and other hazards. Ms. Mitchell stated that the home's interior had exposed wiring and holes in the walls through which one could see outside.

Ms. Mitchell further testified that DCS placed services in the home through Youth Villages, a contractor paid by DCS. Ms. Mitchell explained that despite the provision of a dumpster funded by DCS and offers of assistance from the Youth Villages worker, the parents only succeeded in partially decluttering the yard and the living room of the home while the other rooms remained the same. According to Ms. Mitchell, her later visits to the home demonstrated that the clean-up efforts were not long lasting. On September 10, 2014, the parents, Ms. Mitchell, and the Youth Villages worker prepared a list of items that needed to be remedied before the home would be deemed safe or suitable for the Children. Ms. Mitchell stated that the parents made little progress regarding the deficiencies in the home by the time the case was reassigned to another DCS worker.

Leah Baird, the current DCS worker, testified that she had been assigned to the family since May 1, 2015, approximately four months prior to trial. Ms. Baird related that although she and the Youth Villages worker had an appointment to meet Mother at the parents' home a few days prior to trial, Mother had not been at home. Ms. Baird reported making two other unannounced visits to the home since she was assigned to the case but was unable to find the parents in order to gain entry to the residence. According to Ms. Baird, the home's yard area appeared to have been cleaned somewhat since her earlier visits, although she still observed a large amount of clutter on the porch. She also reported the existence of several vehicles remaining in the yard, a large pile of soda cans outside the door of the home that had drawn bees and insects, and exposed wiring and holes between the home's exterior and interior. Ms. Baird stated that she viewed the addition of an unfinished room apparently under construction on the side of the home. She explained that the improvements appeared incomplete. Ms. Baird presented the court with photographs of the exterior of the home, which depicted the conditions she described in her testimony.

Ms. Baird reported that because she had been unable to gain entry to the interior of the home, she could not determine whether it had been cleaned or whether the other concerns regarding the home's interior had been remedied. Despite the efforts made by Mother and Father, when asked how the parents' home compared to other cluttered homes she had witnessed during her employment with DCS, Ms. Baird described the parents' home as being more cluttered.

Catherine Reynolds, the regional supervisor for the in-home services program at Youth Villages, testified that she and Erin Butler had been assigned to the family in June 2014. She explained that the prior Youth Villages worker, John Mason, was reassigned because the parents were not satisfied with him and due to concerns for Mr. Mason's safety. Ms. Reynolds testified that she and Ms. Butler met with the parents weekly to work with them on parenting skills and improving their housing situation.[4] According to Ms. Reynolds, she and Mr. Mason had both provided the parents with information regarding services offered by ETHRA[5] to help the parents remedy the issues in their home.

Ms. Reynolds stated that by November 2014, she and other workers assigned to the family determined that the parents were not making sufficient progress toward cleaning and repairing the residence. Consequently, she and Ms. Butler met with the parents and helped them develop a budget to determine an amount the parents could afford to pay toward rental of an appropriate home. Ms. Reynolds explained that Father collected a monthly Social Security disability benefit such that the parents never indicated that paying rent would be a major concern. Although Ms. Reynolds and Ms. Butler assisted the parents in applying for public housing, the parents were not approved for such housing. Ms. Reynolds and Ms. Butler then accompanied the parents in viewing three homes that the parents believed they could afford. According to Ms. Reynolds, the parents were supposed to have arranged for the landlord to meet them so they could view the interior of the homes, but when they arrived, no one was present.

The parents both testified that substantial work had been done to the interior of their home in order to add an additional bedroom and to remedy the wiring issues and other problems pointed out by the service workers. The parents admitted, however, that the addition was still incomplete and that they could not guarantee when it would be finished. The parents presented no photographs of the interior of the home, and their claims could not be verified by any of the service workers assigned to the family due to the workers' inability to gain access to the inside of the home.

---

[4] Ms. Reynolds explained that after November 2014, these meetings took place outside the parents' home due to concerns for the service workers' safety following a "threatening gesture" Father made toward Ms. Mitchell.

[5] A widely known acronym for the East Tennessee Human Resource Agency.

Having thoroughly reviewed the evidence presented, we determine that a preponderance of the evidence supports the trial court's findings as to persistence of the conditions leading to removal of the Children from Mother's and Father's home. A comparison of the photographs from February 2014 and the photographs taken in September 2015 demonstrates that there has indeed been some progress made regarding the home's yard area, probably due in large part to DCS's provision of a dumpster. However, there remains a significant amount of clean-up work to be accomplished. Photographs of the exterior of the home taken in September 2015 demonstrate the unfinished construction work, accompanied by large open holes in the walls and exposed cords and wiring. Piles of cans, tires, building materials, and other debris remained around the home. A porch or shed on one end of the home was filled with tools, materials, and waste, much of which appeared to have been untouched for some time.

Furthermore, there was a dearth of evidence to corroborate the parents' claims regarding work performed on the interior of the home. None of the service workers had been able to gain entry to the home for many months. The parents presented no photographic or other evidence to document the positive change they claimed had occurred inside the home. The final viewing by Ms. Mitchell and Ms. Reynolds in late 2014 established that during the two-year period since the Children had been removed, the parents had made only minor improvement to the home and yard, with little enduring effect.

We note that despite the parents' arguments to the contrary, this does not appear to be a case wherein the parents' economic circumstances have prevented them from remedying the conditions in and around the home leading to the Children's removal. The parents admitted that they owned their residence with no mortgage. Father received Social Security disability benefits in the amount of $872 per month. In addition, Father testified that he sold junk metal and aluminum cans to earn extra money. For approximately five months prior to the termination trial, Mother had been employed at a gas station working twenty-five to thirty hours per week and earning $7.50 per hour. According to Mother, she earned, at most, approximately $500 biweekly. In addition, the parties owned several cars that Father admitted could be sold for approximately $3,000. Mother explained that prior to her procurement of employment, the parties had lived solely on Father's income. She could not explain, however, why the addition of her income for the past five months had not improved their living situation.

We conclude that a preponderance of the evidence supports the trial court's factual findings as to persistence of the conditions leading to removal of the Children from Mother's and Father's home and that clear and convincing evidence established this

statutory ground. We therefore affirm the trial court's determination regarding this ground for termination of parental rights.

## B. Substantial Noncompliance with Permanency Plans

The trial court also found clear and convincing evidence that Mother and Father failed to substantially comply with the reasonable responsibilities set out in their permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4; . . . .

Neither Mother nor Father raised this statutory ground as an issue on appeal. Due to the fundamental constitutional interest involved, however, we will address this ground as well. *See In re Carrington H.*, 483 S.W.3d at 525; *see also In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010).

Upon our thorough review of the record, we determine that clear and convincing evidence demonstrated that both Mother and Father failed to substantially comply with the reasonable responsibilities set out in their permanency plans. As previously determined, the parents failed to provide an appropriate home to which the Children could return. In addition, evidence established that the parents failed to follow the recommendations of their psychological evaluations and to fully comply with in-home services. Mother also failed to comply with the recommendations resulting from her alcohol and drug assessment. We conclude that the trial court properly terminated the parental rights of Mother and Father based upon this statutory ground as well.

## V. Best Interest of Children

When at least one ground for termination of parental rights has been established, as here, the petitioners must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *See White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit by the establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White*, 171 S.W.3d at 194.

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Regarding the best interest analysis in this matter, the trial court found:

> In reviewing these factors, the Court relies heavily on the factors detailed in §36-1-113(i)(1) and (2). The Court finds that the parents have failed to make such an adjustment of circumstance, conduct or conditions as to make it safe and in the children's best interest to be returned to the parents' home. This was mainly due to the parents' housing, which while it has been somewhat improved, [it] has not drastically improved to the extent needed for the children to return to the parents. In addition, the parents have not made the progress needed on the permanency plans. Even in the seven months since the Petition to Terminate Parental Rights was filed, the parents have failed to remedy their housing situation and have failed to acknowledge the intensive therapy required for the children to address the past abuse they suffered. The Court can only look at this conduct and the circumstances over this time period and rationally conclude that it is unlikely to change in the near future.

> In addition, the Court finds that the parents have failed to effect a lasting adjustment after reasonable efforts by available social service agencies for such duration of time, that lasting adjustment does not appear possible. Again, the Court finds that reasonable efforts were made by DCS and Youth Villages, as discussed above, to assist the parents in remedying their circumstances. The parents have failed to make such a lasting adjustment after roughly twenty-one months, and thus the Court finds that such an adjustment does not appear reasonably possible.

> Further, the Court heard extensive testimony that the children are doing well in their respective foster homes and placements, that they have bonded to their foster families and that they wish to be adopted. The Court can only conclude that termination of the parental rights is in the children's best interests.

Having carefully considered the record in this cause, we agree with the trial court's determination regarding the best interest of the Children. Our review of the evidence in light of the statutory factors listed above reveals that Mother and Father did not demonstrate that they had made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the Children's best interest to be in their home. Father and Mother failed to provide a safe and adequate home to which the Children could return. In addition, the parents failed to address their mental health issues, and Mother failed to address her long-term methadone use.

Mother and Father also did not demonstrate that they had effected a lasting adjustment after reasonable efforts made by social service agencies. DCS made reasonable efforts to assist Mother and Father in this matter, including the provision of in-home services for more than two years. DCS also provided referrals and funding for psychological evaluations, provided referrals and funding for Mother's alcohol and drug assessment, and facilitated visitation with the Children. DCS procured and paid for the rental of a dumpster for the parents to utilize in their cleaning efforts. Youth Villages helped the parents apply for public housing and provided the parents with contact information for other services related to housing. DCS provided drug screens, gas cards, and offered to pay one month's rent and utilities if a new home could be located. DCS entered into permanency plans with the parents and provided a list of suggested repairs for the family home. DCS workers further testified that while they attempted to maintain contact with the parents and attempted numerous home visits, they were often unable to make contact. Because these Children had been removed for approximately thirty-three months at the time of trial with little progress made by the parents, it appears that a lasting adjustment would be unlikely in the near future.

Although the evidence did establish that Mother and Father exercised fairly regular visitation with the Children, the evidence is somewhat conflicting as to whether a meaningful relationship existed between the parents and the Children. Some of the Children resisted visitation after being in foster care for a period. The Children's therapists at one point respectively opined that visitation was detrimental to the Children's progress in therapy. The trial court suspended visitation for a term of several months due to allegations that Father coached the Children not to speak about the abuse they suffered at their paternal grandmother's home and due to the increase in behavioral issues following visits. Patrick L., the only child who testified, stated that he was not happy in the group home in which he lived and that he wanted to return to the parents' home. A change of caretakers would likely have a negative effect on the emotional and psychological condition of the younger three children, however, based on the bond they had formed with their foster parents. Testimony demonstrated that the oldest child and the youngest three children were thriving in the care of their pre-adoptive foster family.[6]

We note that Patrick L.'s guardian *ad litem* has objected to termination of the parents' rights, arguing that termination is not in Patrick L.'s best interest because he might not be an adoptable child due to his age and other concerns. The guardian's argument appears to be primarily premised on the theory that Patrick L. would be better served living with his parents, despite the demonstrated deficiencies with such home environment, than to remain in foster care and confront the risk of not being adopted. This Court has previously rejected the argument that adoption must be immediately

---

[6] Two of the children were placed into group homes due to behavioral issues. Ms. Baird testified, however, that she believed an adoptive home could be found for these children as well.

contemplated in order for termination to be appropriate. *See In re Chloe R.P.*, No. E2010-01257-COA-R3-PT, 2011 WL 578534, at *3 (Tenn. Ct. App. Feb. 17, 2011); *State Dep't of Children's Servs. v. D.G.B.*, No. E2001-02426-COA-R3-JV, 2002 WL 31014838, at *9 (Tenn. Ct. App. Sept. 10, 2002); *see also In re Audrey S.*, 182 S.W.3d at 879. Furthermore, there has been no showing in this case that Patrick L. could be returned to the care of his parents at an early date. Thirty-three months after removal of the Children, the parents had failed to remedy the conditions leading to removal such that Patrick L. could safely reside in the family home. The parents had also failed to address their psychological issues and long-term use of controlled substances, either of which could result in further neglect to this child. We find the guardian *ad litem*'s argument to be unpersuasive.

Regarding the remaining factors, proof in the record indicated that Mother and Father had shown neglect toward the Children when the Children were in the parents' care. Furthermore, the physical environment of the parents' home was not shown to be healthy and safe for the Children due to environmental concerns and the consistent presence of prescribed controlled substances. The parents' failure to comply with the recommendations of their psychological evaluations indicated that the parents' mental and/or emotional status could be detrimental to the Children or prevent the parents from effectively providing safe and stable care and supervision for the Children. Neither parent presented proof of having paid child support.

Based on our review of the evidence in light of the statutory factors, we conclude that the trial court did not err in finding clear and convincing evidence that termination of Mother's and Father's parental rights was in the best interest of the Children. We affirm the trial court's determination regarding the Children's best interest.

## VI. Conclusion

For the reasons stated above, we affirm the judgment of the trial court terminating the parental rights of Mother and Father based on the grounds of persistence of the conditions leading to the Children's removal and substantial noncompliance with the permanency plans. We reverse the trial court's finding regarding the ground of abandonment by failure to provide a suitable home in that DCS has conceded that the requirements of this statutory ground were not proven by clear and convincing evidence. The trial court's judgment terminating Mother's and Father's parental rights is affirmed in all other respects. Costs on appeal are taxed to the appellants, Tonya F. and Joshua F. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE